1

2

3

4

5        UNITED STATES DISTRICT COURT

6        EASTERN DISTRICT OF WASHINGTON

7   DAVID W. SANDERS,

8                        Plaintiff,                NO:  12-CV-0580-TOR

9        v.                                        ORDER GRANTING DEFENDANT'S
                                                   MOTION FOR SUMMARY
10  ENERGY NORTHWEST, a                            JUDGMENT
    Washington municipal corporation,
11
                        Defendant.
12

13       BEFORE THE COURT is Defendant's Motion for Summary Judgment

14  (ECF No. 47). This matter was heard with oral argument on February 20, 2014.

15  John P. Sheridan appeared on behalf of the Plaintiff. William G. Miossi and Angel

16  Rains appeared on behalf of the Defendant. The Court has reviewed the completed

17  briefing and the record and files herein, and is fully informed.

18                              **BACKGROUND**

19       This case concerns Plaintiff's discharge from his position with Defendant,

20  which Plaintiff claims is a violation of the whistleblower retaliation provisions of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 1

42 U.S.C. § 5851 of the Energy Reorganization Act ("ERA"). For the reasons discussed below, the Court finds that Plaintiff's termination did not violate the ERA.

## FACTS

Defendant Energy Northwest ("EN") is a Washington municipal corporation that owns and operates the Columbia Generating Station ("CGS"), a nuclear power plant in Richland, Washington. ECF No. 56 at 24.  EN terminated its at-will employee Plaintiff David Sanders ("Sanders") from his position as a maintenance supervisor on April 20, 2011, after nineteen years of employment.  *Id*. at 2. Sanders oversaw contractors and administered work for EN's contracts with companies that provided it with temporary staffing needs. *Id*.

Sanders claims he was terminated for two activities—opposing a condition report designation and advocating a change in badging procedure—which are protected under whistleblower retaliation protections in 42 U.S.C. § 5851 of the Energy Reorganization Act ("ERA"). ECF No. 56 at 25.  Defendant characterizes these as four instances of allegedly protected activity: Plaintiffs' dispute over a 30-day access policy, ownership of a condition report, a condition report designation, and a change in badging procedure. ECF No. 47 at 2-4. The parties also cite another incident involving employee Ricky Hayes, which EN claims prompted Plaintiff's termination.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 2

### 1. Condition Reports

Two allegedly protected activities concerned ownership and designation of Condition Reports ("CRs").  CRs are internal reports generated by EN employees when, *inter alia*, EN procedures may have been violated. CRs are designated in decreasing order of severity as "Alpha," "Bravo," "Charlie," or "Delta." ECF No. 47 at 3.

Sanders and EN's then-Security Compliance Supervisor, Bruce Pease ("Pease"), disagreed over a CR concerning maintenance contractors who violated the 30-day access rule.  ECF No. 56 at 25, 27.  The 30-day access policy governs procedures by which an individual can maintain Unescorted Access Authorization ("UAA"). UAA is a security clearance status required for personnel working at nuclear power plants in the United States to gain access to certain areas of a plant without an escort, which is addressed by Nuclear Regulatory Commission regulations at 10 C.F.R. Parts 26 and 73.  *Id*. at 25.  The disagreement between Sanders and Pease began when one CR was designated "Bravo" for an instance when a company employee left employment without terminating his UAA badge within three days, as was required by company policy.  *Id*. at 27.  Sanders and Pease argued over who should "own" the CR because both wanted to control how

1   to fix it.[1]  After a CR review meeting and management advising Sanders and Pease

2   to discuss their differences outside the meeting, Sanders' department ultimately

3   took responsibility for remedying the Bravo designated CR.  *Id*. at 27, 28.

4          Approximately two weeks later, a second CR was issued for Pease's security

5   department and designated "Charlie" for an alleged incident where an employee's

6   UAA badge was not terminated in accordance with certain EN procedures.  *Id*. at

7   28.  Sanders disputed the Charlie designation with Pease and management in a CR

8   review meeting because the incident was similar to the CR Bravo designation his

9   department was remedying.  *Id*. at 29, 30.  Again, Sanders and Pease were advised

10  to discuss the issue outside the meeting and told to resolve it. At the CR review

11  meeting the next morning, Sanders stated he would no longer dispute the

12  designation and would "let it go as a Charlie." *Id*. at 29; ECF No. 48-2 Sanders'

13  Depo. at 26.

14         **2. Badging Procedure**

15         Two more allegedly protected activities concerned badging procedures. The

16  first concerned Plaintiff's dispute with Pease regarding the 30-day access policy

17  where an individual who has been granted UAA can maintain his or her clearance.

18  [1] At oral argument, the parties clarified that "own" means whose department would

19  be responsible for *remedying* the issue identified in the CR, as opposed to owning

20  it for purpose of punishment or demerit, which is not the issue here.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 4

ECF No. 56 at 25.  This policy is a security clearance status required by nuclear power plant personnel to gain unescorted access to certain areas of the plant, and it is covered by Nuclear Regulatory Commission ("NRC") regulations.  *Id*. Individuals with UAA status must "badge in" at an access point once every 30 days and be observed by a member of EN management in order to maintain their clearance. *Id*. at 25-26.  After an employee violated the 30-day badge-in procedure due to an injury, Sanders suggested moving the badge-in point. ECF No. 48-2, Sanders' Depo. at 13. Sanders explained that the change would be "less burdensome for everybody on-site from an administrative standpoint," and that it would be "more accommodating and just as effective." *Id*. at 18-19. Sanders testified that "[t]he NRC information did not require you to come through the turnstile." *Id*. at 15.

Then, in February or March 2011, Sanders suggested changing EN's UAA processing procedure for temporary workers scheduled to perform maintenance work at CGS.  ECF No. 56 at 30.  The existing procedure provided that if a contract worker was on EN's site for more than five days, the security department must start the badging process for them, including a background check and other functions to determine if the employee or contractor meets NRC criteria for obtaining UAA clearance. *Id*. Plaintiff proposed allowing contractors to come to the site for training without having to begin the process because it would "save

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 5

money." ECF No. 56 at 11; ECF No. 48-2, Sanders' Depo. at 29 ("I said we need

something so we can do this without costing the company money.").

### 3. The Hayes Incident

On January 28, 2011, Dale Atkinson, a vice president of EN, began

investigating per diem payments made to contract worker, Ricky Hayes ("Hayes")

in 2009. ECF No. 48 at 13; ECF No. 56 at 10-11.

In 2009, Hayes was hired by one of the contract companies EN worked with,

Nelson Nuclear, Inc. ("NNC"), which provided personnel to commercial nuclear

facilities and DOE sites. ECF No. 56 at 3. NNC is owned and operated by Richard

Nelson ("Nelson"), a friend and former colleague of Sanders. *Id.* at 2. Nelson

received Hayes' name from Sanders after EN was short a contract worker for the

semi-annual maintenance process. *Id*. at 3, 35 (Sanders testified he advised Nelson

to hire Hayes). At the time of his hire, Hayes had been living with Sanders'

daughter in the Tri-Cities area for eight months and working at Target in

Kennewick, Washington. *Id*. at 34-35.[2]  On the application Hayes completed for

NNC, he listed South Carolina as his permanent address because, even though he

had been working at Target for several months, he had not decided whether he

would remain in Washington. *Id*. at 4.  Additionally, at the time of his hiring,

Hayes was registered to vote in South Carolina, had a South Carolina driver's

---

[2] Hayes and Sanders' daughter had a child together.  ECF No. 48 at 11.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 6

license, and indicated in his paperwork that taxes should be taken out for South Carolina. *Id*. As the technical representative on the NNC contract, Sanders approved the paperwork that enabled Hayes to receive per diem because Hayes was working away from his permanent residence. *Id*. During the five week contract work Hayes did for EN, Hayes completed a Personal History Questionnaire ("PHQ") which is required by the NRC to collect data to determine whether an individual is trustworthy, reliable, and fit for duty prior to granting and while maintaining an UAA. *Id*. at 5. In the PHQ, Hayes listed South Carolina as his permanent address. After the form was completed, an outside vendor, Pinnacle, did a background check, and the security department, either Pease or a designee, reviewed the information both independently and with Hayes, and also verified Hayes' employment at Target. *Id*. at 6. In August 2009, after Hayes made the decision to move his residence to Washington, Hayes was temporarily hired by EN and completed another PHQ, this time listing Washington as his permanent address. *Id*. at 7. EN hired Hayes permanently in February of 2010, had Hayes fill out another PHQ, and again Hayes listed Washington as his permanent residence. *Id*. at 8.

In an email dated January 28, 2011 between Atkinson and Pam Bradley ("Bradley"), EN's acting general counsel, Atkinson asked Bradley to investigate a 2009 per diem issue pertaining to Hayes raised by Bill Penwell ("Penwell"). *Id*. at

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 7

10-11.  In 2009 or 2010[3], Penwell, then an EN manager, notified Atkinson that his wife "mentioned that this gentleman that was working for [Sanders] that actually lived in the Tri-Cities[4] area and had actually lived there for a couple of years and was getting per diem." *Id.* at 7-8. After EN began its investigation of Hayes' per diem payments in January 2011, it learned Hayes received a total of $7,177.30 for expenses related to travel to and from Washington and per diem payments in May and June of 2009.  ECF No. 48 at 10-11.

On March 16, 2011, two weeks after the second dispute over badging procedure, EN gathered information about Hayes, Sanders, and Hayes PHQs and per diem in 2009.  ECF No. 56 at 13.  That same day Hayes was interviewed by Kurt Gosney ("Gosney"), the then security compliance supervisor Pease and Jerry Ainsworth, EN's Technical Specialist.  *Id.*  Hayes was told he had filled out his PHQs incorrectly by not listing a Washington address.  *Id.* at 13, 14.  Hayes admitted to living continuously in Washington since the summer of 2008 and agreed that he was not entitled to per diem during the time in question but received

---

[3] Penwell claims the conversation was in 2009. Atkinson claims it was November or December of 2010.

[4] The Tri-Cities area encompasses the Washington cities of Pasco, Kennewick, and Richland, where the CGS is located.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 8

it anyway.   ECF No. 48 at 15.  Following the interview, Hayes signed a written statement and was consequently fired for the per diem payments he received. *Id*.

Pease, Gosney, and Ainsworth also interviewed Sanders on March 16, 2011, about Hayes' per diem payments. ECF No. 56 at 42; ECF 48 at 15-16. Sanders confirmed he was aware Hayes was living in Kennewick when Hayes contracted to work with NNC, and admitted Hayes should not have received payment for travel to and from South Carolina from Washington.  ECF No. 56 at 42-43; ECF 48 at 16. Sanders was placed on administrative leave and a pre-termination hearing followed.  ECF 48 at 17.

On April 7, 2011, Sanders attended a pre-termination hearing and supplied information about other contractors receiving per diem and travel expenses he believed were similar to his situation.  ECF No. 56 at 44.  At that meeting, Sanders explained that "the travel approval was an error."  ECF No. 48-2, Sanders' Depo. at 60-61 ("I explained to them it was done from home along with approving probably three to 400 other things through the Triple A screen and I just didn't see it.  It was wrong.").  In a letter dated April 20, 2011, Sanders was notified of his termination. ECF No. 48 at 18.

After his termination, Sanders' filed an ERA complaint, and subsequently testified in Nelson's Department of Labor hearing after his UAA clearance was

revoked.  Plaintiff brought suit in this Court under the ERA's whistleblower

protection "kick out" provision, 42 U.S.C. § 5851.  ECF No. 1.

## DISCUSSION

### A. Legal Standard

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law.  *Id.* at 248.  A dispute concerning any such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party.  *Id.*  In ruling upon a summary judgment motion, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372,

1    378 (2007).  Only evidence which would be admissible at trial may be considered.

2    *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

3    **B. Whistleblower retaliation provisions of 42 U.S.C. § 5851 of the Energy**

    **Reorganization Act ("ERA")**

5        The whistleblower retaliation provisions of 42 U.S.C. § 5851 of the Energy

6    Reorganization Act ("ERA") are intended to protect energy workers from

7    retaliation based on their concerns for safety and quality. *See Mackowiak v. Univ.*

8    *Nuclear Sys., Inc.*, 735 F.2d 1159, 1163 (9th Cir. 1984). The provisions provide an

9    administrative procedure through which an employee can seek redress for

10   violations of this prohibition. Under the relevant section of the act, "[N]o employer

11   may discharge any employee or otherwise discriminate against any employee with

12   respect to his compensation, terms, conditions, or privileges of employment

13   because the employee (or any person acting pursuant to a request of the

14   employee)" engaged in certain protected acts. 42 U.S.C. § 5851(a)(1).[5]

15   [5] An aggrieved employee may file a complaint with the Secretary of Labor

16   ("Secretary"). 42 U.S.C. § 5851(b)(1). If the Secretary has not issued a final

17   decision within one year after the filing of an administrative complaint, the

18   employee may file an action in federal district court. *Id.* § 5851(b)(4). Sanders

19   alleges in his complaint that he has filed a whistleblower complaint under Section

20   211 of the ERA with the Department of Labor; the DOL did not issue a final

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 11

The statute provides for a burden-shifting scheme, under which the complainant must make a "prima facie showing that any behavior described in subparagraphs (A) through (F) of subsection (a)(1) of this section was a contributing factor in the unfavorable personnel action alleged in the complaint." 42 U.S.C. § 5851(b)(3)(A). But "[r]elief may not be ordered under paragraph (2) if the employer demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of such behavior." 42 U.S.C. § 5851(b)(3)(D).[6]

### a. Whether Sanders' Engaged In Protected Activity

The ERA whistleblower protection provisions apply only to certain activities. The ERA provides that employers may not discharge or discriminate

---

decision within a year. ECF No. 1 at 2. Thus, this Court has jurisdiction pursuant to 42 U.S.C. § 5851(b)(4).

[6] "The Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, effective October 24, 1992, amended section 210 to incorporate a burden shifting paradigm whereby the burden of persuasion falls first upon the complainant to demonstrate that retaliation for his protected activity was a 'contributing factor' in the unfavorable personnel decision." *Doyle v. United States Secretary of Labor*, 285 F.3d 243, 249 (3d Cir. 2002).

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 12

against an employee because the employee:

> **(A)** notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.);
> **(B)** refused to engage in any practice made unlawful by this chapter or the Atomic Energy Act of 1954, if the employee has identified the alleged illegality to the employer;
> **(C)** testified before Congress or at any Federal or State proceeding regarding any provision (or proposed provision) of this chapter or the Atomic Energy Act of 1954;
> **(D)** commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
> **(E)** testified or is about to testify in any such proceeding or;
> **(F)** assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

42 U.S.C. § 5851(a)(1).

Generally "an employer may fire an employee for any reason at all, so long as the reason does not violate a Congressional statute." *Kahn v. United States Secretary of Labor,* 64 F.3d 271, 280 (7th Cir. 1995).[7] The first question, then, is whether Sanders' activities were protected under the whistleblowing statute. As listed above, in addition to enumerated protections, the statute also includes a catch-all provision protecting employees "in any other action to carry out the purposes of [the safety statutes]." 42 U.S.C. § 5851(a)(1)(F). Courts interpret the

---

[7] The parties agree Plaintiff was an at-will employee.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 13

statute broadly to implement its "broad, remedial purpose." *Mackowiak v. University Nuclear Sys., Inc.,* 735 F.2d 1159, 1163 (9th Cir. 1984). The policy behind a broad interpretation "encourages safety concerns to be raised and resolved promptly and at the lowest possible level of bureaucracy, facilitating voluntary compliance with the ERA and avoiding the unnecessary expense and delay of formal investigations and litigation." *Bechtel Const. Co. v. Sec'y of Labor*, 50 F.3d 926, 933 (11th Cir. 1995).

Certain acts are squarely within the statute's protections. In *Mackowiak*, a quality control inspector talked to inspectors from the NRC in connection with their ongoing investigation into his employer, UNSI. *Mackowiak*, 735 F.3d at 1161. Participation in a NRC proceeding was explicitly protected under § 5851. *Id.* at 1162. The court stated, "In a real sense, every action by quality control inspectors occurs "in a NRC proceeding" because of their duty to enforce NRC regulations." *Id.* at 1163.  In *Stone & Webster Eng'g Corp.,* the court stated, "if an employee talks about safety to a plant fire official, an employer and an industry regulator, he or she acts squarely within the zone of conduct that Congress marked out under 42 U.S.C. § 5851(a)(1)." *Stone & Webster Eng'g Corp. v. Herman,* 115 F.3d 1568, 1573 (11th Cir. 1997).

Despite this broad construction, "[t]o constitute a protected safety report, an employee's acts must implicate safety definitively and specifically." *Am. Nuclear*

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 14

1   *Res., Inc. v. U.S. Dep't of Labor*, 134 F.3d 1292, 1295 (6th Cir. 1998) (citing

2   *Bechtel Construction Co. v. Secretary of Labor*, 50 F.3d 926, 931 (11th Cir. 1995)

3   (holding that a carpenter's acts were protected where he "raised particular, repeated

4   concerns about safety procedures," which were "tantamount to a complaint.").

5   "[G]eneral inquiries regarding safety do not constitute protected activity." *Bechtel*,

6   50 F.3d at 931. "The ERA does not protect every incidental inquiry or superficial

7   suggestion that somehow, in some way may possibly implicate a safety concern."

8   *Am. Nuclear*, 134 F.3d at 1295. "[A]n employer may terminate an employee who

9   behaves inappropriately, even if that behavior relates to a legitimate safety

10  concern." *Id.* (citing *Dunham v. Brock*, 794 F.2d 1037, 1041 (5th Cir. 1986)).

11      Courts have also held that the ERA protects acts that implicate safety. In

12  *Bechtel Const. Co.,* the Eleventh Circuit found that, while general inquiries

13  regarding safety are not protected, an employee's voicing of his "particular,

14  repeated concerns about safety procedures for handling contaminated tools" was a

15  protected activity.  *Bechtel Const. Co.,* 50 F.3d at 931.  When working in

16  radioactive areas with radioactive tools, crew members would have a health

17  physics (HP) staff person on duty measure the amount of contamination and write

18  the rate of contamination on a tag attached to the bag containing the tools. *Bechtel*

19  *Const. Co.,* 50 F.3d at 929.  The procedure was known as "taking a dose rate and

20

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 15

1  tagging" the tools. *Id*. Nichols, a crew member, disagreed with Wright, the

2  foreman, over the procedure.

> Based on his training, Nichols understood that contaminated tools
> were to be put in two double polyurethane bags and carried to the
> "frisking station" where the HP technician on duty could take a dose
> rate and tag them. Wright told Nichols that the tools could be placed
> in a single bag, and if the HP technician was not at the frisking station,
> the tools could be taken to the HP technician in the dry storage
> warehouse for dosing and tagging. Nichols disagreed and stated that
> he believed safety procedures required that the tools be surveyed at
> the tool box.

8  *Id.* Nichols made an anonymous complaint to the senior HP supervisor, told his

9  foreman's supervisor, and also approached HP technicians and the HP supervisor

10 to discuss the issue. *Id.*

11      However, the ERA does not protect "every incidental inquiry or superficial

12 suggestion that somehow, in some way may possibly implicate a safety concern."

13 *American Nuclear,* 134 F.3d at 1295. In *American Nuclear*, the Sixth Circuit found

14 that the employee's acts lacked a sufficient nexus to safety concerns where the

15 employee "never alleged that [his employer] was violating nuclear laws or

16 regulations," "never alleged that [his employer] was ignoring safety procedures or

17 assuming unacceptable risks," and where the employee's "conduct never led

18 anyone to change, probe, or even question [the employer's] safety procedures." *Id.*

19 at 1296.  In *American Nuclear*, an employee was contaminated because the

20 Radiation Protection personnel ("RP"s) failed to spray him down quickly, after

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 16

which the employee complained that the RPs did not know what they were doing, grew angry while the RPs administered his full body count test, and asked for a copy of the body count after the test. *Id*. The court found this too tenuous a link to protected activity, stating that "to constitute a protected safety report, an employee's acts must implicate safety definitively and specifically." *Id.* at 1295.

Here, Sanders' conduct unequivocally falls outside the scope of ERA protection because it lacks a sufficient nexus to safety concerns. Sanders alleges he engaged in two types of protected activities giving rise to his termination in violation of the whistleblowing statute: the CRs and the badging procedures. The Court considers each in turn.

### i.    The CR Designations

The CR designation disputes do not implicate safety. The first dispute concerned which department "owned" the condition report for the purposes of remediation.  The dispute centered around which party would be responsible for resolving the issue, not whether there was a safety violation or whether it would be reported.  The second CR dispute likewise only concerned the labeling of the severity of the reported incident. Sanders argues the specific designation implicated a safety issue because the Bravo designation warrants a root cause analysis to the violation, whereas the Charlie designation process is not as complicated. But this dispute did not concern whether the incident was reported or

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 17

whether it would be addressed, but rather the priority and depth of its resolution. As in *American Nuclear*, Sanders' acts lack a sufficient nexus to safety concerns because he "never alleged that [his employer] was violating nuclear laws or regulations," "never alleged that [his employer] was ignoring safety procedures or assuming unacceptable risks," and where the employee's "conduct never led anyone to change, probe, or even question [the employer's] safety procedures." *American Nuclear*, 134 F.3d at 1296.  EN and its management were fully aware of the violations before and after Sanders' dispute about who should own the condition report or what label to assign the second one.  Sanders' disagreement with Pease about who would remedy the first or what label applied to the second, do not "implicate safety definitively and specifically."

### ii.    The Badging Procedure

Sanders also argues that the badging procedure "implicates safety because it concerns when individuals are and are not allowed on a nuclear facility and the level of security clearance needed to be on the facility at that time." ECF No. 55 at 21. EN counters that it was not protected because Sanders advocated the changes to save time and money, and the current policy was not governed by NRC regulations.  The Court agrees with EN; neither badging activity can be described as protected under the whistleblower statute.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 18

With respect to the badge-in location, Sanders testified that he wanted to change the location of the badge-in because it was "more accommodating and just as effective." Sanders Depo., ECF No. 48-2 at 18. As a result, Sanders testified, he "got rid of....approximately 100 to 200 CRs written on people not entering the turnstile gates, which was time-consuming for the people that have to resolve the CRs and it wasn't providing a product that was worthwhile." *Id*. The procedure, Sanders explained, was "less burdensome for everybody on-site from an administrative standpoint," including him. *Id*. at 19. Thus, Sanders seems to imply that because it was "less burdensome" administratively, it freed up administration to deal with more pressing problems.

With respect to Sanders' desire to change the timing for contractor badging during training, Plaintiff testified that "[w]e need to change it so we can save the company money."  ECF No. 56-2, Exhibit 1 at 39; ECF No. 56 at 11. Pease may have written the policy, but EN's policy contained in the GIH required the contractors to badge for the training. ECF No. 56-2, Exhibit 1 at 38-39. Pease objected to changing the GIH.  *Id*. Sanders, however, obtained permission through his own chain of command. *Id*.  When Pease learned that Sanders had succeeded in

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 19

1    having the badging procedure changed, he allegedly said to Sanders "that's twice

2    and [he] owed [him] one." *Id*. at 40.[8]

3         Sanders' advocacy of badging procedure change—for location and timing—

4    cannot be construed as "acting in furtherance of safety compliance" because it does

5    not appear that the changes improved safety, or even that Sanders suggested the

6    changes for that purpose.  Sanders himself admits that the changes were made to

7    save money and for administrative ease.  ECF No. 48-2, Sanders' Depo. at 18-19,

8    33. Critically, it is also undisputed that the changes were not required to comply

9    with the NRC. *Id*. at 15.  When asked if he believed there was a safety issue with

10   the badging procedure, Sanders said "no." *Id*. Furthermore, the Court cannot see

11   how *delaying* the time for badging *improves* safety, since contractors would be on

12   site for training without any badging procedure started. Likewise, changing the

13   badging location to make it more accessible does not appear to be a safety concern,

14   particularly because the change made it easier for employees to maintain their

15   UAA status. Procedures that Plaintiff admits do not involve safety, which do not

16   appear to improve safety, and which Plaintiff himself states were made to save

17   money or administrative time do not "implicate safety definitively and

18   

19   [8] However, this comment is hearsay and the Court does not rely upon it in its

20   decision.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 20

specifically" as required under the relevant case law. Such changes fall into the category of "incidental inquiry or superficial suggestion" to which the Sixth Circuit declined to extend protection in *American Nuclear. See American Nuclear*, 134 F.3d at 1295.  Indeed, under Plaintiff's theory, *any* company cost cutting suggestion could implicate safety because it would free up personnel and money for safety programs.  That, however, is not the test.

Thus, because none of Sanders' alleged activities rise to the level of protected activity under the ERA or the associated case law, the Court finds that Plaintiff has failed to meet his burden in establishing a prima facie case of retaliation under the whistleblower statute.

## C. Other Matters

Plaintiff asks the Court to delay ruling until additional comparator information is received in discovery, should the Court find that issues in this case "turn on whether Sanders improperly awarded Hayes per diem." ECF No. 55 at 25-26. However, since the Court's decision rests on other facts, this request is denied.

Having found that Plaintiff has failed to show that he engaged in protected activity, as required under the statute, the Court need not consider whether Defendant would have taken the same adverse action regardless of the employee's activity. Here, EN has come forward with compelling evidence that it discharged Sanders solely because he approved travel and per diem payments to Hayes with

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 21

knowledge that Hayes had been living in the Tri-Cities with Sanders' daughter for at least eight months and the two had a child together.  Sanders' speculation that Pease's participation in the per diem investigation was somehow nefarious does not advance his cause; Pease was Sanders' equal, not his supervisor. Pease did not terminate Sanders.  Sanders has contrived a retaliation claim out of what appears to be a personality conflict with Pease, not based on protected conduct that implicates "safety definitively and specifically."

## CONCLUSION

The Court finds that Plaintiff has not shown that he engaged in protected activity, thus Plaintiff has not met his burden as required under  42 U.S.C. § 5851.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.  Defendant's Motion for Summary Judgment (ECF No. 47) is

    **GRANTED**.

2.  All pending hearings and trial are vacated as **MOOT**.

The District Court Executive is hereby directed to enter this Order, enter Judgment for Defendant, provide copies to counsel, and **CLOSE** the file.

**DATED** April 4, 2014.



THOMAS O. RICE
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 22